AO 91 (Rev. 5/85) Criminal Complaint      AUSA Mark D. Johnson

# United States District Court

## SOUTHERN DISTRICT OF FLORIDA

UNITED STATES OF AMERICA

v.

**CRIMINAL COMPLAINT**

ROMAN C. MESINA
(Male, DOB: 10-12-63)

CASE NUMBER: 03-06-FUL

-and-

JOHN R. TAYLOR
(Male, DOB: Unknown)

(Name and Address of Defendant)

I, the undersigned complainant being duly sworn state the following is true and correct to the best of my knowledge and belief. On or about September 2002, to on or about January 2, 2003, in Martin and Palm Beach Counties, in the Southern District of Florida and elsewhere the defendants,

> did knowingly combine, confederate, and agree with each other and with others known and unknown, to conduct and attempt to conduct financial transactions, affecting interstate commerce, involving property represented to be the proceeds of specified unlawful activity with the intent to conceal or disguise the nature, location, source, ownership, or control of the property believed to be the proceeds of specified unlawful activity,

in violation of Title __18__ United States Code, Sections 1956(a)(3)(B) and 1956(h).

I further state that I am a Special Agent, U.S. Customs Service and that this complaint is based on the following facts:

### PLEASE SEE ATTACHED AFFIDAVIT.

Continued on the attached and made a part hereof:      __X__ YES ____ NO

_____
Signature of Complainant
SANTIAGO D. DOSIL
Special Agent
U.S. Customs Service

Sworn to before me, and subscribed in my presence,

January 21, 2003                    at      Fort Pierce, Florida
Date                                         City and State

FRANK J. LYNCH, Jr.
UNITED STATES MAGISTRATE JUDGE
Name and Title of Judicial Officer          Signature of Judicial Officer

**AFFIDAVIT**
**OF**
**SANTIAGO D. DOSIL**
**SPECIAL AGENT**
**U.S. CUSTOMS SERVICE**

I, Santiago D. Dosil, after being duly sworn, depose and state:

1.  I am a Special Agent (S/A) with the United States Customs Service, Fort Pierce, Florida and have been so since March 1988. Prior to 1988, I was employed by the Internal Revenue Service.

2.  This affidavit is made in support of a complaint against Roman C. Mesina and John R. Taylor for violation of Title 18 U.S.C. 1956(h).

3.  In or about June 2002, I was contacted by the FBI and advised that a cooperating individual (hereafter CI) had stated that Roman C. Mesina (hereafter Mesina), who like the CI resided at the *Residences of City Place* in West Palm Beach, had approached the CI and asked him if he or any associates were in need of "offshore banking services," a phrase the CI understood to mean money laundering. This CI was, at that time, pending sentencing in a federal prosecution for violation of 18 U.S.C. 1956(h), and desired to provide substantial assistance to obtain a sentence reduction.

4.  Once the CI feigned some interest, Mesina told the CI that he was involved in transporting currency in bulk out of the United States to the Cayman Islands using a female pilot who flew from Whitham Field in Stuart, Florida. In order to determine if Mesina was offering to launder money for the CI, the CI was authorized by your affiant to clandestinely record conversations with Mesina. In addition, a monitored meeting was arranged between Mesina and the CI.

5.   On or about July 24, 2002, Mesina met with the CI to discuss laundering currency.  During this recorded meeting, Mesina offered to launder currency at the rate of $20,000 to $30,000 per day for a six percent commission fee.  The CI explained to Mesina that the CI's "people" had accumulated currency from the sale of illegal narcotics and asked Mesina if he would still be willing to launder that currency.  Mesina replied that he did not care where the money came from, but would not physically handle any drugs himself.  Mesina also stated that he relied on the assistance of a bank official offshore and had "an insider" at one or more domestic financial institutions to facilitate the laundering of money within the United States.  During this meeting, Mesina also told the CI that the female pilot he had been using to transport bulk currency was not currently available as her license had been suspended for failure to pass a psychological examination.  Mesina further described this pilot as living on 9th Street, West Palm Beach, and during the meeting attempted to call her on his cell phone at two different numbers to see whether or not her license had been, or soon would be, restored.  A subsequent review of records for the cell telephone Mesina utilized in making those two calls revealed that they were made to a home telephone and cell phone of a woman who lived on 9th Street, West Palm Beach.  Your affiant's review of FAA licensing records established that this woman's pilot's license had been suspended for failure to provide required medical and psychological testing results to the FAA.

6.  At this meeting Mesina also represented that he had been laundering money for the previous fifteen years.  He also stated that he belonged to a criminal organization that would not permit him to quit, explaining that the penalty for trying to quit by

2

drawing his finger across the front of his neck to indicate that the penalty would be death.

7. On or about September 23, 2002, the CI had a meeting that was recorded with Mesina at a designated location. The CI provided Mesina with $25,000 in U.S. currency for the purposes of laundering the currency to an undercover bank account in Miami, Florida. Mesina received a six percent commission of which, in theory, two percent was "kicked back" to the CI. In fact, the CI paid Mesina a four percent commission, which like the $25,000, had been provided by a government agency. Mesina agreed to transfer the monies to the undercover bank account. Records for that bank account indicate that on or about September 24, 2002, $25,000 was wire-transferred to the account from CitiBank of New York.

8. On October 10, 2002, the CI had a recorded meeting with Mesina at an apartment in West Palm Beach, Florida. The CI provided Mesina with $50,000 in U.S. currency for the purpose of hiding the real source of that currency by establishing a false trail of the funds before they were deposited in the same undercover bank account utilized in the transaction described in paragraph 7 above. Mesina was paid a four percent commission, having theoretically kicked back two percent of the agreed six percent commission to the CI who, in fact, received no such commission. Undercover bank records indicate that on or about October 15, 2002, a Bank of America cashier's check under the name of Kol Auto Leasing was deposited in the amount of $50,000 to the undercover account in Miami, Florida. Although the money was deposited, the bank placed a hold on the funds. At the direction of your affiant, the CI told Mesina that his "client," a fictional Colombian drug trafficker, was unhappy about the unavailability of

3

the funds. Mesina replied that although he had a contact, that is a vice-president, at the bank where the undercover bank account was located, he had better contacts at the Bank of America and asked the CI to have his client, who Mesina referred to as "the Chinaman," open an account there.

9. On the day of that meeting, investigating agents using undercover identification opened a bank account at the Bank of America branch at US 1 and Bridge Road, Hobe Sound, Martin County, Florida.

10. On October 25, 2002, the CI had a recorded meeting with Mesina in West Palm Beach, Florida. At that meeting, the CI provided Mesina with $50,000 in U.S. currency for the purpose of hiding the real source of that currency by establishing a false trail of the funds prior to their deposit in the undercover Bank of America account in Martin County, Florida. At the same time Mesina, as he previously had, received a four percent commission. Records of the Martin County undercover account indicate that on or about October 30, 2002, a Bank of America cashier's check from Tortuga Trading LTD., in the amount of $50,000 was deposited to the Martin County undercover account. During this meeting, Mesina inquired as whether the source of these funds might be al-Qaida, at which time the CI answered no, that the funds were drug money from the Colombian drug trafficker.

11. On November 4, 2002, the CI had a recorded meeting with Mesina in West Palm Beach, Florida. At that time, the CI provided Mesina with $44,000 in U.S. currency for the purpose of hiding the real source of that currency by establishing a false trail of the funds prior to their deposit in the undercover Bank of America account in Martin County, Florida. At the same time Mesina

4

received a four percent commission.  Records obtained from the Martin County undercover account indicate that on or about November 8, 2002, a Bank of America cashier's check in the amount of $50,000 from Kol Motors Inc., was deposited in that account.

12.  Following the deposit of those funds, the CI, at the request of your affiant and other law enforcement officers, requested that Mesina launder a larger amount of currency, proposing to deliver in excess of $100,000.  Mesina indicated that since his pilot was unavailable he would have trouble laundering that money and initially introduced the CI to a woman who has been identified by your affiant, saying that this woman had the ability to move more money than the CI.  The woman, however demanded a commission of twenty-five percent which, at the direction of your affiant and other law enforcement officers, the CI refused to pay.

13.  After Thanksgiving and continuing through the middle of December 2002, Mesina and the CI continued to negotiate a fee for laundering larger sums.  During this period of time, a court authorized pen register/trap and trace on a cell telephone number utilized by Mesina revealed a large number of lengthy calls to a person calling himself John R. Taylor, a Swiss citizen, who lived in the same City Place complex as the CI and Mesina.

14.  On December 20, 2002, the CI had a recorded meeting in West Palm Beach with Mesina who brought the person calling himself John R. Taylor (hereafter Taylor) with him.  Mesina introduced Taylor to the CI and told the CI that Taylor had access to a pilot and offshore accounts that would permit the timely laundering of larger sums of money.  Mesina explained that the utilization of these additional resources was expensive and insisted that a commission of ten percent, in addition to any commission the CI

5

might receive, would be required.  The CI then provided Mesina and Taylor with $125,000 in U.S. currency for the purpose of hiding the real source of that currency by establishing a false trail of the funds prior to their deposit in the undercover Bank of America account in Martin County, Florida.  The CI also gave Mesina and Taylor $12,500 in currency to satisfy the agreed ten percent commission.  During this meeting and prior to actually delivering the currency, the CI told Mesina and Taylor at three different times that the source of all the funds was a Colombian drug trafficker who would likely kill them if the money were lost. Records of the Martin County undercover account indicate that on or about January 2, 2003, a Bank of America cashier's check from Tortuga Trading, LTD in the amount of $2,500 was deposited to that account and that on that same day, $122,500 was wire-transferred into the account.

Affiant further sayeth naught.

SANTIAGO D. DOSIL
Special Agent
U.S. Customs Service

Sworn and subscribed to before me this 21st day of January 2003.

FRANK J. LYNCH, Jr.
UNITED STATES MAGISTRATE JUDGE

6