UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF FLORIDA

CASE NO. 03-14010-CR-GRAHAM

UNITED STATES OF AMERICA

v.

ROMAN C. MESINA,

Defendant.

_____/

## SENTENCING MEMORANDUM

COMES NOW, the Defendant, by and through undersigned counsel, and hereby submits the following Sentencing Memorandum for the Court's consideration and in response to the Presentence Report prepared in this cause.

The Defendant submits that the offense level computation in the Presentence Report is inaccurate. Specifically, the Government will not meet its burden of proof pertaining to the specific offense characteristics that: 1) Mr. Mesina knew the laundered funds represented the proceeds of distribution of a controlled substance (United States Sentencing Commission, *Guidelines Manual*, Section 2S1.1(b)(1)(Nov. 1, 2001)) and 2) that Mr. Mesina was in the business of laundering funds prior to the instant offense (Id. at Section 2S1.1(b)(2)(C)). The Defendant also objects to the two-level increase under the Government's obstruction of justice theory (Id. at Section 3C1.1) and the corresponding denial of the three-level reduction for acceptance of responsibility (Id. at Section 3E1.1). The Defendant withdraws his objection raised in previous pleadings pertaining to the 14-level increase to the base offense level based on a sentencing manipulation theory.



1

## <u>KNOWLEDGE THAT FUNDS WERE FROM THE</u><br><u>PROCEEDS OF NARCOTICS DISTRIBUTION</u>

The Government's claim that Mr. Mesina knew the money laundering conspiracy involved proceeds from illegal narcotics distributions cannot be substantiated.  The Government has the burden of persuasion and production regarding enhancements to the base offense level.  <u>United States v. Agis-Meza</u>, 99 f.3d 1052 (11th Cir. 1996).  The applicable standard is preponderance of the evidence.  <u>United States v. Jackson,</u> 57 F.3d 1012 (11th Cir. 1995).  In the instant case, the references by the Confidential Informant (C.I.) to the monetary source were ambiguous.  As a result, although the C.I. makes several attempts to engage Mr. Mesina in conversation about the source of the money to be laundered, Mr. Mesina never affirmatively acknowledged that he knew where the money was coming from.  At one point, the C.I. also informs Mr. Mesina that the money source was actually engaged in a different business unrelated to the illegal narcotics trade, therefore further confusing the situation.

Mr. Mesina's discussions with the C.I. regarding where the money was coming from represented, at best, a conscious indifference to knowing about the source of the funds.  Mr. Mesina tells the C.I. on numerous occasions "I don't want to know" when the C.I. attempts to raise this subject in conversation.  However, it is obvious that the C.I. was instructed to keep discussing this issue so that there would be some evidence to substantiate an enhancement.  Even thought the C.I. goes to great lengths to get the Defendant to confirm his knowledge about the source of the money, the Defendant never confirms to the C.I. that he knew the money was coming from illegal narcotics operations.

2

The C.I. told the Defendant on at least one occasion that the people behind the money were in the jewelry business, not the drug trade. Specifically, during a recorded conversation between the C.I. and Mr. Mesina on July 24, 2002, the C.I. states that he told the people behind the money that Mr. Mesina "[did not] care where the money comes from…(Transcript of 7/24/02 meeting, Page 133-134)." Mr. Mesina then replies, "I don't care where it comes from. I don't transport drugs physically, physically. I will not do that (Id.)." Mr. Mesina then reiterates his feelings about this when he says, "I don't care where the cash comes from. It's none of my business (Id.)." The C.I. then questions Mr. Mesina further, "**If** it's (sic) come from drugs - - (emphasis added)?" Mr. Mesina again responds, "I don't care…I don't care where the money comes from (Id.)." The Defendant submits that the hypothetical questions posed by the C.I. do not represent affirmative evidence that the Defendant acknowledged the illicit source of the money.

The claims about the source of the money become further confused when the C.I. continues to talk about his contacts. Namely, as the conversation on July 24, 2002 continues, the C.I. tells Mr. Mesina something different about the people behind the money. When talking about the amount of money to be laundered, the C.I. implies that the source of the money did not have millions of dollars, but they were seeking to launder smaller amounts, in the $ 15-20,000.00 range. The C.I. states, "They don't want to do a million…They don't have that money. If they do a million, it's stupid anyway because they're going to sit and wait. They don't have three hundred million dollars. No. We're talking about the guy like twenty, fifteen thousand - - I mean fifteen million dollars cash. **They're in [the] diamond business, jewelry business** (emphasis added)(Id. at Page 141,

Lines 18-25)."  To this, Mr. Mesina again replies "No, I don't care where they get it (Id. at Page 142, Line 7)."

Under Section 2S1.1(b)(1), the 6-level enhancement applies if the Defendant knew or believed that any of the laundered funds were the proceeds of, or were intended to promote (i) an offense involving the manufacture or distribution of controlled substances; (ii) a crime of violence; or (iii) an offense involving firearms, explosives, national security, terrorism, or the sexual exploitation of a minor.  United States Sentencing Commission, *Guidelines Manual*, Section 2S1.1(b)(1)(Nov. 1, 2001).  As demonstrated by the transcript references listed above, the C.I. first makes a vague reference in the form of a "what if?" situation to the fact that the source of the money might involve a narcotics operation.  But, the C.I. then switches gears and informs the Defendant that the source of the money was someone in the diamond and jewelry business.  As a result, the Government fails to substantiate that the Defendant knew this was drug money he was handling, especially since the C.I. is the one who tells Mr. Mesina something different.  Here, the Defendant's conduct does not satisfy any of the criteria under this enhancement, as the 6-level bump up does not apply to unlawful jewelry operations.

By way of counterargument, the Government may claim that Mr. Mesina was willing to handle drug money because he repeatedly told the C.I. he did not care where the money came from.  However, the Defendant's responses do not rise to the level of an affirmative, knowing agreement to launder drug money, nor do these facts substantiate that the Defendant believed that this was drug money.  Rather, Mr. Mesina states that he doesn't care if the source is someone in the jewelry business.  The Government must

4

demonstrate more than a willingness on the Defendant's part to get involved in any criminal activity. The Government must substantiate that the Defendant had knowledge of his role in a specified illegal operation, or had reason to believe that the money was from the narcotics trade.

The Defendant's indifference falls short of confirming that he knew the source of the money was narcotics based. The Government therefore fails to meet their burden regarding this enhancement, especially since the C.I. himself refutes this theory when he tells Mr. Mesina that the operation involved the jewelry and diamond trade.

## CLAIM THAT THE DEFENDANT WAS
## IN THE BUSINESS OF LAUNDERING FUNDS

Under Section 2S1.1(b)(2)(C) of the Sentencing Guidelines, a 4-level enhancement is warranted if the Defendant "was in the business of laundering funds." United States Sentencing Commission, *Guidelines Manual*, Section 2S1.1(b)(2)(C)(Nov. 1, 2001). However, the Government's contention that the Defendant was in the business of laundering funds is inaccurate and the Government will not be able to sustain its burden regarding this sentencing enhancement.

The Commentary to this Guidelines provision explains that the Court shall consider the totality of the circumstances in determining whether Mr. Mesina was in the business of money laundering. Id. at comment. (n.4(A)). The Commentary to the Guidelines also outlines a non-exhaustive list of factors to aid the Court in its determination. Id. at comment. (n.4(B)). After applying these factors to the instant case, the "in the business" enhancement is inapplicable to the Defendant and the Court should reject this adjustment.

5

The first factor the Court may consider is whether the Defendant regularly engaged in laundering funds.  Id. at comment. (n.4(B)(i)).  The Government maintains that the Defendant was involved in the business of laundering funds for years based on Mr. Mesina's statements to the C.I.  However, other than conversations between the Defendant and the C.I. where the Defendant makes up a false history about himself, purporting to be an experienced money launderer, the Government has no evidence that the Defendant was a money launderer by trade.  For example, the Government points to the Defendant's claims that he was involved previously in transporting currency in bulk to the Cayman Islands using a female pilot and that he engaged bank officials to aid him in his previous endeavors.  The PSI also refers to the Defendant's claim that he "had been doing this for years" and had "good clientele."  However, despite Mr. Mesina's claims that he was experienced in the money laundering business, the Defendant was not involved in money laundering in any way prior to the instant offense.

The Defendant submits that statements he made to the C.I. regarding his prior utilization of offshore and domestic bank officials to aid him in his money laundering efforts were not true.  Further, the Defendant was not involved with money laundering "for years," nor did the Defendant have "good clientele."  All of these statements represent the Defendant's efforts to impress the C.I. so that the C.I. would then go into business with him.  These efforts represent no more than bragging on the Defendant's part and the Government cannot prove the truth of these statements.

Further, Mr. Mesina did not have a working relationship with any pilots.  Rather, the Defendant merely interjected the name of a pilot he knew into the conversation with the C.I. in an effort to convince the C.I. that he was something he was not – an

6

experienced money launderer.  Although Mr. Mesina did know a pilot, no illegal operations were ever undertaken between this pilot and Mr. Mesina.

Regarding the Defendant's claim that he had a fifteen-year history laundering funds for a criminal organization that would not allow him to quit, these statements were not true either.  For example, the Defendant was in the U.S. Military for part of this "fifteen year" time period and stationed in Europe.  Again, the Defendant made these statements in an effort to impress the C.I. and to gain the confidence of this potential business partner.  The Defendant's efforts to impress the C.I. are no different from the C.I.'s misrepresentations regarding his true background and involvement with money laundering.  Simply stated, if the truth were told, neither the C.I. nor the Defendant would have agreed to work with each other.  So both parties made themselves out to be something they were not.  They were puffing.

The Defendant submits that he did not have people working for him inside the bank.  The Government may attempt to substantiate this claim by arguing that the government operatives moved their undercover account to a different bank at Mr. Mesina's direction.  The inference is that the Defendant must have had a reason for this account switch – namely that his "inside" bank employees must have worked at that branch.  However, the only reason Mr. Mesina suggested that the undercover account be moved to Bank of America was because Bank of America represented the financial institution where the Defendant had the various "KOL" business accounts.  Therefore, it was convenient to simply move the money between the various accounts within one institution, rather than several.  Contrary to the Government's argument, the Defendant

believed that this centralized effort would facilitate the movement of money without drawing too much attention from bank employees.

The Government is unable to demonstrate that the Defendant regularly engaged in money laundering. The Defendant was having trouble laundering even the initial amounts in this scheme, as demonstrated by the fact that he used some of his own business accounts to launder the money and the transactions took time to accomplish. There was no sophisticated banking structure in place facilitated by the Defendant and the account transactions easily led back to Mr. Mesina.

Mr. Mesina's efforts were low-level attempts at money laundering and the Defendant found himself in over his head early on in the conspiracy. The Defendant was trying to bring other people into the scheme because he could not handle the steadily increasing amounts of money brought to him by the Government. For example, on November 14, 2002, a recorded conversation between the C.I. and the Defendant reveals that Mr. Mesina was concerned about the higher and higher amounts of money the C.I. was asking him to launder. When the C.I. asked the Defendant to launder $125,000.00, the Defendant replies, "I can't do it. Sorry…I can't do it right now." Then, on November 18, 2002, the Defendant introduced the C.I. to a female source who he believed could launder the larger amounts sought by the C.I. These facts demonstrate that the Defendant was not regularly engaged in the business of laundering or else he would have been able to handle this operation independently and without help from others.

The second factor is whether the Defendant engaged in laundering funds during an extended period of time (Comment. (n.4(B)(ii)). If the requisite time period the Court

is to consider is prior to the instant offense, the Defendant had no prior experience and therefore was not a long-time money launderer. This is substantiated in the arguments outlined above.

If the Government contends that the instant offense qualifies under this element, than those facts do not support this "in the business" factor either. Namely, the conspiracy lasted from approximately July 24, 2002 to January 22, 2003, a period of six months. The Defendant was therefore not involved in this operation for an extended amount of time.

The transactions conducted during this window were also sporadic because the Defendant did not have the financial structure established to handle the larger sums suggested by the C.I. The first transaction did not occur until September 23, 2002, when the Defendant accepted $ 25,000 from the C.I. The subsequent exchanges occurred on October 10 and October 25, 2002, November 4, 2002 and December 20, 2002. The Defendant was subsequently arrested on January 22, 2003. As conspiracies can span years, even decades, the Defendant would submit that this operation was not conducted over a considerable amount of time. The duration of the conspiracy was also under the direction of the Government, as they arranged and monitored the various meetings between the C.I. and Mr. Mesina. Therefore, the analysis should consider the Government's role in controlling the timing of the transactions when the instant offense is being considered versus an analysis based on previous conduct.

The third factor for the Court's consideration is whether the Defendant engaged in laundering funds from multiple sources (Comment. (n.4(B)(iii)). This factor is inapplicable and further demonstrates that Mr. Mesina was not a professional money

launderer.  In this case, the Government was the only source of the money laundering conspiracy.  Even though the Government may again claim that the Defendant himself talked about "other clients," the Defendant was under extensive government surveillance during this six-month time period.  If the Defendant was laundering money for other people, the agents would have evidence to this effect.  The Government therefore cannot successfully claim that the Defendant was laundering money for multiple sources.

The fourth factor considers whether the Defendant generated a substantial amount of revenue in return for laundering funds (Comment. (n.4(B)(iv)).  Examining this factor from past conduct, Mr. Mesina was not involved in laundering operations previously, so there is no revenue to consider in this regard.  Regarding the facts of the instant case, the agreement between the Defendant and the Government was for him to receive 4 % of the amount laundered and the C.I. agreed to 2 %.  The funds laundered by the Defendant totaled $ 294,000.00.  At 4 %, the Defendant therefore collected approximately $ 11,760 in revenues for his efforts.  This does not represent a substantial amount of revenue relative to a money laundering scheme and this factor again fails to support the Government's contention that Mr. Mesina was a professional money launderer.

The fifth factor takes into account whether the Defendant had one or more prior convictions for money laundering or monetary reporting violations (Comment. (n.4(B)(v)).  Since the Defendant does not have a prior record for any offense of this magnitude, this element does not support the enhancement that Mr. Mesina was "in the business."

The last factor involves whether the Defendant made statements that he engaged in any of the conduct proscribed in the first five factors (Comment. (n.4(B)(vi)).  As

stated above, there was no truth behind the Defendant's statements to the C.I. The façade Mr. Mesina created via his bragging and puffing represented an effort to fit into the operation devised and furthered by the Government. If these statements had any merit, the Government would have the documentary and/or surveillance evidence to substantiate the applicability of this factor and the Defendant would have been indicted for these other schemes if they existed. The Defendant submits that there must be some indicia of truth behind his statements for this factor to apply.

The fact that the Defendant conveyed all of his thoughts and ideas readily to the C.I. further demonstrates that Mr. Mesina did not know what he was doing. Would an experienced criminal in this field talk without suspicion to a complete stranger about getting involved in a money laundering operation? Would an experienced money launderer agree to always meet in the C.I.'s apartment, or in public, when conducting business of this nature?

The surveillance video shows Mr. Mesina acting like an amateur time and time again. For example, in one video, the Defendant states that the C.I.'s ex-wife told him (the Defendant) that the C.I. had gone to prison previously for money laundering. But, even given this information, it does not register with Mr. Mesina that this could be a sting operation. Rather, Mr. Mesina merely admonishes the C.I. about his wife's talking. In comparison, an experienced money launderer would not overlook this information and then simply set up the next transaction. Here, the Defendant not only looks beyond the obvious fact that he was the target of a sting operation, but he continues to go to great lengths to impress the C.I. by making up information in order to secure the next deal.

The fact that the Defendant introduces the C.I. to two other people who can handle large transactions again demonstrates that Mr. Mesina was inexperienced and in over his head.  There simply was nothing special about the Defendant's efforts during this operation.  The only notable thing about Mr. Mesina's conduct here was the fact that it was amateurish.

Importantly, the Court should not overlook the Defendant's unsophisticated conduct throughout this enterprise.  The Sentencing Guidelines range is high without any enhancements, which reflects the legislative intent to punish severely those who launder proceeds from specified unlawful activities.  Given the severity of the consequences, the Government has an obligation to prove each proposed enhancement with credible and substantive evidence.  However, after applying the factors outlined above, the claim that Mr. Mesina was employed previously as a professional money launderer is not supported by the evidence.  The Government fails to meet its burden regarding this enhancement.

## ADJUSTMENT FOR OBSTRUCTION OF JUSTICE

The Defendant objects to an enhancement for Obstruction of Justice in this case based on Mr. Mesina's statements to the Magistrate Judge regarding his qualification for appointed counsel.   First, the PSI mischaracterizes the Court's questioning of Mr. Mesina regarding his qualification for appointed counsel.  Mr. Mesina did not deny having any money or other assets, as the PSI states in paragraph 20.  With respect to bank accounts, the Court asked Mr. Mesina whether he had "[a]ny bank accounts with [his] name on them?"  (Transcript of January 23, 2003 Hearing, P. 5, L. 23).  Mr. Mesina truthfully explained that he had two accounts with his name on them with about $2,100 in

them (Id, at P. 5, L. 25 – P. 6, L. 2).   Mr. Mesina further stated that he had another

$3,500 or $4,000 in cash, and truthfully stated that he had an interest in a car dealership.

Second, while the government may have learned "after the hearing" (PSI

Paragraph 21) that Mr. Mesina was a signatory on the "Jewish Fellowship" and "KOL

Auto Finance LLC" accounts, the government was aware at the time of Mr. Mesina's

initial appearance that Mr. Mesina had a connection to these accounts.  For example, the

Government maintains that the Defendant utilized at least one of these accounts, the

Jewish Fellowship account, to launder money involved in this conspiracy (PSI

Paragraphs 11 and 14).  The Government also had Mr. Mesina's checkbooks for these

accounts in its possession at the time of Mr. Mesina's initial appearance, both

checkbooks having been seized from Mr. Mesina at the time of his arrest.  Since the

government was aware of the existence of these accounts, there would have been no

motive for Mr. Mesina to knowingly lie about his connection to the accounts.

Even though the funds in these accounts may have belonged to Mr. Mesina, he

had no reason to believe, at the time of his initial appearance, that the Government

intended to give him access to the account checkbooks or to any of the funds in these

accounts.  This is particularly true since the Government contends that some of the

money involved in this conspiracy was laundered through these accounts.  Further, when

the checkbooks were returned to undersigned counsel recently, counsel learned that the

bank had placed security holds on both of these accounts.  The bank only agreed to

release funds to counsel after the bank received a copy of the Order of Magistrate Judge

Lynch dated July 2, 2003.  This Order detailed the agreement by the Government to

provide undersigned counsel with the checkbooks for these accounts.  Due to the bank

13

placing holds on the accounts, and the Government's possession of the checkbooks, it would have been difficult, if not impossible, for Mr. Mesina to access these accounts at the time of the initial appearance for the purpose of retaining counsel.

Mr. Mesina's statements regarding his qualifications for appointment of counsel do not rise to the level of perjury, as would be required to justify an enhancement for obstruction of justice. "In applying [the Obstruction of Justice] provision in respect to alleged false statements or testimony by the defendant, the court should be cognizant that inaccurate testimony or statements sometimes may result from confusion, mistake, or faulty memory and, thus, not all inaccurate testimony or statements necessarily reflect a willful attempt to obstruct justice." See United States Sentencing Commission, *Guidelines Manual*, Section 3C1.1 (Comment. (n.2)(Nov. 1, 2001)). Moreover, the Government bears the burden of proving each element necessary to establish the upward enhancement for obstruction of justice. United States v. Guzman, 318 F.3d 1191, 1198 (10th Cir. 2003). In the case of obstruction based on claimed perjury, the Government must prove that the defendant "gave false testimony concerning a material matter with the willful intent to provide false testimony, rather than as a result of confusion, mistake, or faulty memory." United States v. Dunnigan, 507 U.S. 87, 94 (1993)(setting out the elements necessary to establish a perjury-based obstruction of justice enhancement).

The claim that Mr. Mesina did not mention these accounts to the Magistrate Judge does not, by itself, establish that he committed perjury. At the time of the initial appearance, Mr. Mesina was under enormous stress, having just been arrested on a serious federal charge. Mr. Mesina did not, at the time of questioning, have the benefit of any legal representation. Mr. Mesina had no motive to lie about the existence of these

accounts, since the government had his checkbooks and thus knew of the accounts. To

the extent that Mr. Mesina had these accounts in mind at all at the time of the initial

appearance, he would have had no reason to believe that the accounts would be available

to him, since the Government had his checkbooks and claimed that the account(s)

contained proceeds from the conspiracy. Indeed, since the bank froze the accounts after

his arrest, an assumption by Mr. Mesina that the funds in the accounts were unavailable

would have been correct.

The facts before the Court are insufficient to sustain the Government's burden of

proving a perjury-based obstruction of justice enhancement. This enhancement should be

deemed inapplicable to the instant offense.

## ACCEPTANCE OF RESPONSIBILITY

The Defendant objects to the Government's assertion that he should not receive

the 3-level reduction for Acceptance of Responsibility. Since the Obstruction of Justice

enhancement is not warranted (see above), this upward enhancement does not disqualify

Mr. Mesina from the downward adjustment for Acceptance of Responsibility. Mr.

Mesina's forthright and timely plea of guilty, without the benefit of any plea agreement,

and his detailed and sincere letter accepting responsibility for his offense, qualify him for

a three-level Acceptance of Responsibility reduction. Even if the Obstruction of Justice

enhancement was applicable (and undersigned counsel vehemently disagrees that it

should be), this is one of the "extraordinary cases" in which an adjustment for

Acceptance of Responsibility would still be appropriate. See United States Sentencing

Commission, *Guidelines Manual*, Section 3E1.1, comment. (n.4)(Nov. 1, 2001).

The Defendant did not knowingly and willfully Obstruct Justice.  Therefore Mr. Mesina qualifies for the reduction based on Acceptance of Responsibility.  The Defendant clearly accepted responsibility for his actions, and did so in a timely manner.  The Defendant should thus be given a downward adjustment for acceptance of responsibility for admitting to his role in this conspiracy and exhibiting remorse for his unlawful conduct.

## PERSONAL AND FAMILY CONSIDERATIONS

The PSI fails to adequately reflect Mr. Mesina's family background.  The Defendant experienced an extremely difficult childhood due to his father's deception regarding the identity of his mother.  Namely, the Defendant's mother literally walked away from the family when Mr. Mesina was approximately two years old.  This situation resulted in the Defendant and his brother being cared for by their father, who later told Mr. Mesina that his mother was dead when he inquired about her.  When the Defendant was eventually reunited with his mother when he was fourteen, it was only after his father demanded that the Defendant's mother claim that she was just a family friend.  When Mr. Mesina finally learned the true identity of his mother, it was very confusing for him because he had felt abandoned by his mother and insecure regarding where he fit in with the family.

The instability in Mr. Mesina's life continued because he was also constantly shuffled between family members.  The Defendant spent time in the Philippines, New York and California as a youth.  As a result of the lack of stability provided at home, the Defendant joined the Air Force at an early age.

16

## MENTAL AND EMOTIONAL CONSIDERATIONS

The PSI fails to explain that the Defendant is currently being treated while in custody for depression and emotional issues. Mr. Mesina is currently prescribed Depakote for this, and had been taking Prozac, as previously prescribed by jail staff. This is important because Mr. Mesina's incarceration has taken a toll on him psychologically.

It should also be noted that it was when Mr. Mesina was under the extreme stress of the initial arrest and detainment that he made the statements to the Magistrate Judge which are now the subject of scrutiny regarding the Obstruction of Justice enhancement. Mr. Mesina did his best to answer the questions posed by the Court in light of the traumatizing circumstances.

## MILITARY HISTORY

The Defendant submits that the PSI fails to state that he received several service awards while in the Air Force.

## FINANCIAL CONDITION:  ABILITY TO PAY

The Defendant's balance for the Jewish Fellowship account has changed since Probation drafted the PSI. An exact account balance is not known, as the Defendant has outstanding and ongoing bills accruing for his defense, including to the investigator hired by the Defendant and other professionals in the Defendant's employ. It is anticipated that this account will not have significant assets by the time of sentencing. Given the Defendant's debts and lack of significant assets, the Defendant does not have the resources to pay a fine.

17

## SENTENCING COMPUTATION

The Defendant submits that the PSI computation of a total offense level of 34 is inaccurate, given the arguments outlined above pertaining to the obstruction of justice and acceptance of responsibility issues, the elevation due to the source of the funds allegedly stemming from narcotics operations and the claim that the Defendant is in the business of laundering funds.  Since the Government will not be able to sustain its burden with regard to these issues, the offense level computation and corresponding Guidelines range should be adjusted downward accordingly.

## CERTIFICATE OF SERVICE

**I HEREBY CERTIFY** that a true and correct copy of the foregoing has been furnished to the Office of the United States Attorney, Mark Johnson, Esq., 505 South 2nd Street, Suite 200, Fort Pierce, Florida  34950, ~~James Eisenburg, Esquire, Attorney for Co-Defendant John Taylor, 250 South Australian Avenue, Suite 704, West Palm Beach, Florida 33401~~, United States Probation Officer, Patricia Borah, 501 S. Flagler Dr., Suite 400, West Palm Beach, FL 33401-5912, Clerk, United States District Court, 301 North Miami Avenue, Miami, FL, 33128 and, on this 2nd day of September, 2003.

THE LAW OFFICES OF NELLIE L. KING, P.A.
319 Clematis Street, Suite 107
West Palm Beach, FL  33401
Telephone 561-833-1084
Fax 561-833-1085


BY: _____
Nellie L. King, Esquire
Florida Bar Number 0099562