# United States District Court

Southern _____ DISTRICT OF _____ Florida _____

USA v. Roman

**EXHIBIT AND WITNESS LIST**

CASE NUMBER: 03-14010-CR-TYC

| PRESIDING JUDGE | PLAINTIFF'S ATTORNEY | DEFENDANT'S ATTORNEY |
|---|---|---|
| DONALD L. GRAHAM | MARK Johnson | Nellie King, ESQ. James Eisenberg, ESQ. |
| TRIAL DATE(S) | COURT REPORTER | COURTROOM DEPUTY |
|  | Carly Horenkamp | C Foster |

| PLF. NO. | DEF. NO. | DATE OFFERED | MARKED | ADMITTED | DESCRIPTION OF EXHIBITS* AND WITNESSES |
|---|---|---|---|---|---|
| ✓ |  | 9-8-03 | 8 | yes | Business of Laundering  2 pages |
| ✓ | " " | 9 | " | Sophisticated Laundering |
| ✓ | " " | 16 | " | Dr. Bryan, Pshy. Report [DO NOT SCAN] |
|  |  |  |  |  |  |
|  | ✓ | 9-8-03 | 1 | yes | 39 page Elliot Wave Astro-Physcia |
|  |  |  |  |  | Na Crowd Psychologia prepared by |
|  |  |  |  |  | N. John Taylor |
|  |  |  |  |  |  |
|  | ✓ | 9-8-03 | 1 | yes | Criminal Complaint |
| ✓ |  | " " | 1 | " | Initial Appearance Transcript Copy |
| ✓ |  | " " | 15 | " | Memo Dated 7-9-03 From M. Johnson, A |
| ✓ |  | " " | 17 | " | Faxed Copy of Dr. Paul E Bryan |
|  |  |  |  |  | Medical resume |
|  |  |  |  |  |  |
|  |  |  |  |  |  |
|  |  |  |  |  |  |
|  |  |  |  |  |  |
|  |  |  |  |  | 84 |
|  |  |  |  |  | 00 |
|  |  |  |  |  |  |
|  |  |  |  |  |  |

* Include a notation as to the location of any exhibit not held with the case file or not available because of size.

Page 1 of ___1___ Pages

GOVERNMENT
EXHIBIT

CASE
NO.  03-14010-DLG

EXHIBIT
NO.        8

# BUSINESS OF LAUNDERING

4. Enhancement for Business of Laundering Funds.--

(A) In General.--The court shall consider the totality of the circumstances to determine whether a defendant who did not commit the underlying offense was in the business of laundering funds, for purposes of subsection (b)(2)(C).

(B) Factors to Consider.--The following is a non-exhaustive list of factors that may indicate the defendant was in the business of laundering funds for purposes of subsection (b)(2)(C):>

    (i) The defendant regularly engaged in laundering funds.

CD#65-02176:  Oh, they're desperate outside.  Shit.  Listen, first, they called me and asked me if a hundred and twenty-five thousand dollars, if you can do it.

Roman Mesina:     I can't do it.  Sorry.

CD#65-02176:  Okay.  Time, he said ten days is fine.

Roman Mesina:     I can't do it right now.

CD#65-02176:  Why?

Roman Mesina:     Because we want the dust to settle a little bit.  We did almost a million last month.  I got to slow down.  (Tr. 11/14/02, p. 114).

    (ii) The defendant engaged in laundering funds during an extended period of time.

Roman Mesina:  And I've been doing this since I was eighteen in Switzerland, so, you know... (Tr. 1/22/03, p. 18).

    (iii) The defendant engaged in laundering funds from multiple sources.

Roman Mesina:  We lost one of our clients back in October.  And that's why I said, you were asking for more volume, and I said we have enough for right now.

UCA Cruz:  We were a little concerned about that.  We were concerned about how long you had been doing this.  We're always, you know, we were holding back so much, and when we had a lot, you couldn't handle it.  We need, you know, we sometimes need to do more volume than three hundred.

Roman Mesina:  Exactly. (Tr. 1/22/03, p. 28).

(iv) The defendant generated a substantial amount of revenue in return for laundering funds.

(v) At the time the defendant committed the instant offense, the defendant had one or more prior convictions for an offense under 18 U.S.C. 1956 or 1957, or under 31 U.S.C. 5313, 5314, 5316, 5324 or 5326, or any similar offense under state law, or an attempt or conspiracy to commit any such federal or state offense. A conviction taken into account under subsection (b)(2)(C) is not excluded from consideration of whether that conviction receives criminal history points pursuant to Chapter Four, Part A
(Criminal History).

(vi) During the course of an undercover government investigation, the defendant made statements that the defendant engaged in *any* of the conduct described in subdivisions (i) through (iv).



GOVERNMENT
EXHIBIT

CASE
NO. 03-14010-DLG

EXHIBIT
NO.      9

# SOPHISTICATED LAUNDERING

(A) Sophisticated Laundering under Subsection (b)(3).--For purposes of subsection (b)(3), 'sophisticated laundering' means complex or intricate offense conduct pertaining to the execution or concealment of the 18 U.S.C. 1956 offense.

Sophisticated laundering typically involves the use of--

(i) fictitious entities;

Mesina:
       Jewish Fellowship, Inc.
       Kol Auto Finance, LLC

Taylor:
       Lancelot Partners, Inc.


(ii) shell corporations;

UCA Herrera:  How are you going to protect the safety?  You going to establish these corporations for us?  You going to start moving this month?  How is he going to protect us?

Mesina:  Yeah.

UCA Herrera:  Especially from IR, I don't want to say the word.

Mesina:  A good  way, also, is - there's a way to buy - - you know what tax I.D. numbers are?

UCA Herrera:  Yeah.

Mesina:  For corporations?  We have a way to buy old corporations that have been on the shelf.  How old?

Taylor:  Aged.

Roman Mesina:  Aged.  Like wine.  Nobody behind them.  Tax I.D. numbers.(Tr.

1

1/22/03, p. 13-14).

Taylor:  If it says SA or L-T-V, when you went to open up those accounts, you had to have a foreign signatory on those accounts, so when you opened the accounts, you know they had to go through WAPEM forms and those type of things.  So those L-T-D accounts are coming under scrutiny.  So what I suggest is, gentlemen, you know, do we want to fight or do we want to win?  And if you want to win, we got to think.  L-T-D is a statutory entity that exists in another jurisdiction that has an account here.  So, what I suggest is, that we're going to decide to form a series of special companies known as non-stock, basically religious corporations.

UCA Cruz:  Okay.

Taylor:  And they have no filing requirements, so they do not - - the only caveat is when the accounts are opened up, they have to be non-interest-bearing.  There can be no interest.

Mesina:  We can get all these opened.

Taylor:  You understand?  This is how churches operate.  The same way.  At the end of the year, what they do is they issue a 1099 on interest.  So since a church is a philanthropic operation, they're not in the business of earning money, you know, they don't want them earning interest.   (Tr. 1/22/03, p. 18-19).

(iii) two or more levels (i.e., layering) of transactions, transportation, transfers, or transmissions, involving criminally derived funds that were intended to appear legitimate; or

Mesina:  But what we're trying to do here is also, if you let us, for example, what we want to be able to do is do this on a weekly basis, you know, like we told George, three hundred every week and it will just trickle in and we'll establish those other entities for you and we're establishing commerce, so to speak.  And any question, everybody's covered.  You're covered, we're covered .  Our strategy is, these other companies are buying software from these other companies.

UCA Cruz:  Okay.

Roman Mesina:  That's all we're going to be doing.

UCA Cruz:  Okay.

Mesina: By invoicing. Now, how those get paid, of course, we take care of it.

Taylor: Okay. So in commerce, what I did, this is just something we came up with, I made it up, so I'm basically level. So, you know, the name of the entity is there. This is an invoice. And then it is sent to us, so we receive this, and then our companies are conducting business with maybe with others... And then we need transparency. In other words, when funds go from here to there, we want to make sure they land in Abaco, so that we can report to you and say, you know, ten thousand units went from here to there.

Mesina: Yeah, but especially in software, all's we're doing is delivering a diskette. Bills of lading, when we're doing offshore and stuff like that . But what we're doing here, you know, it's domestic, just an invoice. (Tr. 1/22/03, p. 7-9).

(iv) offshore financial accounts.

UCA Cruz: My concern is this. We went from six points to ten points, I'm told because you have something special.

Mesina: No. Now it's different. It's become a lot harder right now. And we bring everything overseas. So our cost has significantly increased.

UCA Cruz: When you say you're going overseas - -

Mesina: We're taking everything overseas.

UCA Cruz: You're taking everything overseas?

Mesina: Yeah. And through our means, we have a way of bringing everything back in. (Tr. 1/22/03, p. 2)

---

UCA Cruz: Okay, but my concern is this. If you're physically going out with it, then how do I know that they're not going to get you at the airport going out?

Mesina: Oh, no, no. There's a - - I have other connections that we've done with the pilot and everything. They're not going to get it. (Tr. 1/22/03 p.3-4).

3

(B) Non-Applicability of Enhancement.--If subsection (b)(3) applies, and the conduct that forms the basis for an enhancement under the guideline applicable to the underlying offense is the only conduct that forms the basis for application of subsection (b)(3) of this guideline, do not apply subsection (b)(3) of this guideline.

4

# United States District Court

## SOUTHERN DISTRICT OF FLORIDA

UNITED STATES OF AMERICA

|  |  |
|---|---|
| v. | **CRIMINAL COMPLAINT** |
| **ROMAN C. MESINA** | |
| (Male, DOB: 10-12-63) | CASE NUMBER: 03-06-FUL |
| -and- | |
| **JOHN R. TAYLOR** | |
| (Male, DOB: Unknown) | |
| (Name and Address of Defendant) | |



I, the undersigned complainant being duly sworn state the following is true and correct to the best of my knowledge and belief.  On or about September 2002, to on or about January 2, 2003, in Martin and Palm Beach Counties, in the Southern District of Florida and elsewhere the defendants,

> did knowingly combine, confederate, and agree with each other and with others known and unknown, to conduct and attempt to conduct financial transactions, affecting interstate commerce, involving property represented to be the proceeds of specified unlawful activity with the intent to conceal or disguise the nature, location, source, ownership, or control of the property believed to be the proceeds of specified unlawful activity,

in violation of Title __18__ United States Code, Sections 1956(a)(3)(B) and 1956(h).

I further state that I am a Special Agent, U.S. Customs Service and that this complaint is based on the following facts:

### PLEASE SEE ATTACHED AFFIDAVIT.

*I.D.*

> **DEFENDANT'S EXHIBIT**
>
> CASE NO. 0314010
>
> EXHIBIT NO. 1

...ed and made a part hereof:    __X__ YES ____ NO

_____
Signature of Complainant
SANTIAGO D. DOSIL
Special Agent
U.S. Customs Service

Λ subscribed in my presence,

January __21__, 2003                    at    Fort Pierce, Florida
Date                                              City and State

FRANK J. LYNCH, Jr.
UNITED STATES MAGISTRATE JUDGE
Name and Title of Judicial Officer          Signature of Judicial Officer

**AFFIDAVIT**
**OF**
**SANTIAGO D. DOSIL**
**SPECIAL AGENT**
**U.S. CUSTOMS SERVICE**

I, Santiago D. Dosil, after being duly sworn, depose and state:

1.  I am a Special Agent (S/A) with the United States Customs Service, Fort Pierce, Florida and have been so since March 1988. Prior to 1988, I was employed by the Internal Revenue Service.

2.  This affidavit is made in support of a complaint against Roman C. Mesina and John R. Taylor for violation of Title 18 U.S.C. 1956(h).

3.  In or about June 2002, I was contacted by the FBI and advised that a cooperating individual (hereafter CI) had stated that Roman C. Mesina (hereafter Mesina), who like the CI resided at the *Residences of City Place* in West Palm Beach, had approached the CI and asked him if he or any associates were in need of "offshore banking services," a phrase the CI understood to mean money laundering.  This CI was, at that time, pending sentencing in a federal prosecution for violation of 18 U.S.C. 1956(h), and desired to provide substantial assistance to obtain a sentence reduction.

4.  Once the CI feigned some interest, Mesina told the CI that he was involved in transporting currency in bulk out of the United States to the Cayman Islands using a female pilot who flew from Whitham Field in Stuart, Florida.  In order to determine if Mesina was offering to launder money for the CI, the CI was authorized by your affiant to clandestinely record conversations with Mesina.  In addition, a monitored meeting was arranged between Mesina and the CI.

5.   On or about July 24, 2002, Mesina met with the CI to discuss laundering currency.  During this recorded meeting, Mesina offered to launder currency at the rate of $20,000 to $30,000 per day for a six percent commission fee.  The CI explained to Mesina that the CI's "people" had accumulated currency from the sale of illegal narcotics and asked Mesina if he would still be willing to launder that currency.  Mesina replied that he did not care where the money came from, but would not physically handle any drugs himself.  Mesina also stated that he relied on the assistance of a bank official offshore and had "an insider" at one or more domestic financial institutions to facilitate the laundering of money within the United States.  During this meeting, Mesina also told the CI that the female pilot he had been using to transport bulk currency was not currently available as her license had been suspended for failure to pass a psychological examination.   Mesina further described this pilot as living on 9th Street, West Palm Beach, and during the meeting attempted to call her on his cell phone at two different numbers to see whether or not her license had been, or soon would be, restored.  A subsequent review of records for the cell telephone Mesina utilized in making those two calls revealed that they were made to a home telephone and cell phone of a woman who lived on 9th Street, West Palm Beach.  Your affiant's review of FAA licensing records established that this woman's pilot's license had been suspended for failure to provide required medical and psychological testing results to the FAA.

6.   At this meeting Mesina also represented that he had been laundering money for the previous fifteen years.  He also stated that he belonged to a criminal organization that would not permit him to quit, explaining that the penalty for trying to quit by

2

drawing his finger across the front of his neck to indicate that the penalty would be death.

7. On or about September 23, 2002, the CI had a meeting that was recorded with Mesina at a designated location. The CI provided Mesina with $25,000 in U.S. currency for the purposes of laundering the currency to an undercover bank account in Miami, Florida. Mesina received a six percent commission of which, in theory, two percent was "kicked back" to the CI. In fact, the CI paid Mesina a four percent commission, which like the $25,000, had been provided by a government agency. Mesina agreed to transfer the monies to the undercover bank account. Records for that bank account indicate that on or about September 24, 2002, $25,000 was wire-transferred to the account from CitiBank of New York.

8. On October 10, 2002, the CI had a recorded meeting with Mesina at an apartment in West Palm Beach, Florida. The CI provided Mesina with $50,000 in U.S. currency for the purpose of hiding the real source of that currency by establishing a false trail of the funds before they were deposited in the same undercover bank account utilized in the transaction described in paragraph 7 above. Mesina was paid a four percent commission, having theoretically kicked back two percent of the agreed six percent commission to the CI who, in fact, received no such commission. Undercover bank records indicate that on or about October 15, 2002, a Bank of America cashier's check under the name of Kol Auto Leasing was deposited in the amount of $50,000 to the undercover account in Miami, Florida. Although the money was deposited, the bank placed a hold on the funds. At the direction of your affiant, the CI told Mesina that his "client," a fictional Colombian drug trafficker, was unhappy about the unavailability of

3

the funds.  Mesina replied that although he had a contact, that is a vice-president, at the bank where the undercover bank account was located, he had better contacts at the Bank of America and asked the CI to have his client, who Mesina referred to as "the Chinaman," open an account there.

9.  On the day of that meeting, investigating agents using undercover identification opened a bank account at the Bank of America branch at US 1 and Bridge Road, Hobe Sound, Martin County, Florida.

10.  On October 25, 2002, the CI had a recorded meeting with Mesina in West Palm Beach, Florida.  At that meeting, the CI provided Mesina with $50,000 in U.S. currency for the purpose of hiding the real source of that currency by establishing a false trail of the funds prior to their deposit in the undercover Bank of America account in Martin County, Florida.  At the same time Mesina, as he previously had, received a four percent commission. Records of the Martin County undercover account indicate that on or about October 30, 2002, a Bank of America cashier's check from Tortuga Trading LTD., in the amount of $50,000 was deposited to the Martin County undercover account.  During this meeting, Mesina inquired as whether the source of these funds might be al-Qaida, at which time the CI answered no, that the funds were drug money from the Colombian drug trafficker.

11.  On November 4, 2002, the CI had a recorded meeting with Mesina in West Palm Beach, Florida.  At that time, the CI provided Mesina with $44,000 in U.S. currency for the purpose of hiding the real source of that currency by establishing a false trail of the funds prior to their deposit in the undercover Bank of America account in Martin County, Florida.  At the same time Mesina

4

received a four percent commission. Records obtained from the Martin County undercover account indicate that on or about November 8, 2002, a Bank of America cashier's check in the amount of $50,000 from Kol Motors Inc., was deposited in that account.

12. Following the deposit of those funds, the CI, at the request of your affiant and other law enforcement officers, requested that Mesina launder a larger amount of currency, proposing to deliver in excess of $100,000. Mesina indicated that since his pilot was unavailable he would have trouble laundering that money and initially introduced the CI to a woman who has been identified by your affiant, saying that this woman had the ability to move more money than the CI. The woman, however demanded a commission of twenty-five percent which, at the direction of your affiant and other law enforcement officers, the CI refused to pay.

13. After Thanksgiving and continuing through the middle of December 2002, Mesina and the CI continued to negotiate a fee for laundering larger sums. During this period of time, a court authorized pen register/trap and trace on a cell telephone number utilized by Mesina revealed a large number of lengthy calls to a person calling himself John R. Taylor, a Swiss citizen, who lived in the same City Place complex as the CI and Mesina.

14. On December 20, 2002, the CI had a recorded meeting in West Palm Beach with Mesina who brought the person calling himself John R. Taylor (hereafter Taylor) with him. Mesina introduced Taylor to the CI and told the CI that Taylor had access to a pilot and offshore accounts that would permit the timely laundering of larger sums of money. Mesina explained that the utilization of these additional resources was expensive and insisted that a commission of ten percent, in addition to any commission the CI

5

might receive, would be required.  The CI then provided Mesina and Taylor with $125,000 in U.S. currency for the purpose of hiding the real source of that currency by establishing a false trail of the funds prior to their deposit in the undercover Bank of America account in Martin County, Florida.  The CI also gave Mesina and Taylor $12,500 in currency to satisfy the agreed ten percent commission.  During this meeting and prior to actually delivering the currency, the CI told Mesina and Taylor at three different times that the source of all the funds was a Colombian drug trafficker who would likely kill them if the money were lost.  Records of the Martin County undercover account indicate that on or about January 2, 2003, a Bank of America cashier's check from Tortuga Trading, LTD in the amount of $2,500 was deposited to that account and that on that same day, $122,500 was wire-transferred into the account.

Affiant further sayeth naught.


SANTIAGO D. DOSIL
Special Agent
U.S. Customs Service


Sworn and subscribed to before me this $2/\hbar$ day of January 2003.


FRANK J. LYNCH, Jr.
UNITED STATES MAGISTRATE JUDGE


6

*UNITED STATES DISTRICT COURT*
*SOUTHERN DISTRICT OF FLORIDA*
*MIAMI DIVISION*

UNITED STATES OF AMERICA,

Case 03-14010-Cr-GRAHAM

Plaintiff,

vs.                                    FORT PIERCE, *FLORIDA*
JANUARY 23, 2003

ROMAN C. MESINA,

Defendant.

---

TRANSCRIPT OF INITIAL APPEARANCE
BEFORE THE HONORABLE FRANK J. LYNCH,
UNITED STATES MAGISTRATE JUDGE

APPEARANCES:

FOR THE GOVERNMENT:

*U.S. Attorney's Office*
BY:  MARK JOHNSON, A.U.S.A.
500 East Broward Blvd., 7th Floor
Ft. Lauderdale, FL 33301

FOR THE DEFENDANT:

LEON WATTS, A.F.P.D.
*Federal Public Defender's Office*
200 South Indian Drive
Ft. Pierce, FL  33130

REPORTED BY:          JERALD M. MEYERS, RPR-CM
Miami, FL  33128-7797

STENOGRAPHICALLY REPORTED COMPUTERIZED TRANSCRIPTION

1    (Call to order of the Court)

2         THE COURT:  Okay.  The next case is the United

3    States versus Roman Mesina, 03-06.

4         MR. JOHNSON:  Mark Johnson for the United States,

5    Your Honor.

6         THE COURT:  Good morning.  State your full name

7    please, sir.

8         THE DEFENDANT:  Roman C. Mesina.

9         THE COURT:  Raise your right hand, please.

10   (Whereupon the defendant was duly sworn by the Court)

11        THE COURT:  Okay.  Mr. Mesina, this is an initial

12   appearance hearing on a criminal complaint that has been

13   signed against you.  It is sealed, so I am going to unseal

14   it.

15        The purpose of the hearing is to advise you of

16   your rights and make sure you understand the charges

17   against you and get a copy of that criminal complaint.

18        I also need to find out if you are going to hire

19   your own attorney or if you need a court appointed

20   attorney.

21        If you need a court appointed attorney, I will

22   have to ask you questions under the oath you have been

23   placed as to your assets, where they are and how much they

24   are worth.  After answering those questions, if you

25   qualify, we will appoint an attorney for you.

*U.S.A. vs Roman Mesina, et al - 1/23/03*

1          THE DEFENDANT:  Yes, sir.

2          THE COURT:  Also, I need to make decisions

3   concerning bond or holding you without bond until this case

4   is over.

5          Let me advise you first that you have the right

6   to remain silent at any time today or in the future.  You

7   give up that right if you make any statement, that

8   statement will be used against you.

9          Also, if you begin making a statement and wish to

10  stop at any time, you can stop.  You can also refuse to

11  answer any questions that I ask you, and you do not have to

12  give a reason for refusing.

13         If you do answer any questions today, since you

14  are under oath, the answers must be truthful.  If I later

15  find out an answer is untruthful, it would subject you to a

16  charge of perjury.  Do you understand that, sir?

17         THE DEFENDANT:  Yes, sir, Your Honor.

18         THE COURT:  Okay.  Are you going to hire your own

19  lawyer, sir, or do you need a court appointed lawyer?

20         THE DEFENDANT:  I need a court appointed lawyer.

21         THE COURT:  Let me see if you qualify.  Let's go

22  through my questions.  What is your residence address where

23  you live?

24         THE DEFENDANT:  780 South Sapodilla Avenue, West

25  Palm Beach, Florida 33401.

1          THE COURT:  Okay.  Do you own that residence or

2   do you rent?

3          THE DEFENDANT:  I rent, Your Honor.

4          THE COURT:  And how much rent do you pay a month?

5          THE DEFENDANT:  1,185, Your Honor.

6          THE COURT:  Does anyone else live there with you?

7          THE DEFENDANT:  No, Your Honor.

8          THE COURT:  Do you own any real estate, houses,

9   land or anything like that?

10          THE DEFENDANT:  No, Your Honor.

11          THE COURT:  Let me finish my questions so we make

12   a good record here.  Okay.  Let me finish before you

13   answer.  We are making a tape, and we are talking over each

14   other.  Are you married or single?

15          THE DEFENDANT:  Divorced, Your Honor.

16          THE COURT:  Do you have any children?

17          THE DEFENDANT:  Yes, Your Honor.

18          THE COURT:  How many?

19          THE DEFENDANT:  Three.

20          THE COURT:  And how old are they?

21          THE DEFENDANT:  One is 17 and two are 3 years

22   old.  They are twins.

23          THE COURT:  Do you pay regular support for the

24   children?

25          THE DEFENDANT:  Just the 17 year old, Your Honor.

```
1          THE COURT:  How much do you pay for that?

2          THE DEFENDANT:  200 a month.

3          THE COURT:  Do you have a job?

4          THE DEFENDANT:  Your Honor, I have an interest in

5    a car dealership in West Palm Beach.

6          THE COURT:  What business is that?

7          THE DEFENDANT:  It is called KOL Auto Sales.

8          THE COURT:  KLA?

9          THE DEFENDANT:  KOL.

10         THE COURT:  KOL?

11         THE DEFENDANT:  Yes, Your Honor.

12         THE COURT:  Okay.  Do you receive a salary from

13   that business?

14         THE DEFENDANT:  No, Your Honor.

15         THE COURT:  Do you have any regular income?  That

16   is what I am looking for.

17         THE DEFENDANT:  No, Your Honor.

18         THE COURT:  Okay.  Do you own any cars, trucks,

19   vehicles, boats with your name on them?  Motorcycles?

20         THE DEFENDANT:  No, Your Honor.

21         THE COURT:  No?

22         THE DEFENDANT:  No, Your Honor.

23         THE COURT:  Any bank accounts with your name on

24   them?

25         THE WITNESS:  I have one Wachovia account with
```

1  approximately $72 in it, and I have a Fidelity Investment

2  account with approximately $2,100 in it.

3          THE COURT:  Any other stocks, bonds, mortgages,

4  cash?  Anything like that that you own?

5          THE DEFENDANT:  I think I have about -- I forget

6  the amount of cash.  I think maybe close to 3,500, 4,000.

7          THE COURT:  3,500 or 4,000 in cash?

8          THE DEFENDANT:  Yes.  I am not sure, Your Honor.

9          THE COURT:  Okay.  Anything else worth more than

10  $500 that I haven't touched on?

11         THE DEFENDANT:  No, Your Honor.  Maybe some

12  furniture, and stuff like that.

13         THE COURT:  But no large items.  Equipment or

14  anything like that?  You are shaking your head "no."  Is

15  that right?

16         THE DEFENDANT:  No, Your Honor.

17         THE COURT:  All right.  I am going to find that

18  the defendant is indigent and appoint the Office of the

19  Federal Defender to represent him.

20         MR. WATTS:  Good morning, Your Honor.

21         THE COURT:  Good morning, Mr. Watts.  Mr. Mesina,

22  this is Mr. Watts.  He is an attorney with the Federal

23  Public Defender's Office.  Make sure you tell him

24  everything you know about your case so he can help you.

25  Okay, sir?

1    THE DEFENDANT:  Yes, sir.

2    THE COURT:  Do you read and write English,

3  Mr. Mesina?

4    THE DEFENDANT:  Yes, Your Honor.

5    THE COURT:  Okay.  A copy of the complaint has

6  been given to Mr. Watts.  Mr. Johnson, if you would tell me

7  the charge and the possible maximum penalty, please.

8    MR. JOHNSON:  The charge in the complaint is

9  conspiracy to launder money, in violation of 1956, 18

10  U.S.C. 1956(h).  The maximum possible penalty is 20 years,

11  the possibility of 3 years, not more than 4 years

12  supervised release and a fine of $1,600,000.

13    THE COURT:  Okay.  Do you understand the charges

14  against you, Mr. Mesina?

15    MR. WATTS:  Do you understand what the prosecutor

16  said the charges are?

17    THE DEFENDANT:  Conspiracy to commit money

18  laundering, yes, Your Honor.

19    THE COURT:  Okay.  Right.  This is going to the

20  grand jury next week?

21    MR. JOHNSON:  Yes, Your Honor.

22    THE COURT:  All right.  I am going to set an

23  arraignment for Monday, February 3rd at 9:30 in this

24  courtroom at that time if there is an indictment,

25  Mr. Mesina.

1      Mr. Watts or someone from his office will enter a

2 not guilty plea.  That is what an arraignment is.  If there

3 is no indictment on that day, then we will proceed with a

4 preliminary hearing.  Not a trial.  Just a preliminary

5 hearing.  Mr. Watts can explain that further to you if you

6 need him to.

7      What is the government's recommendation as to

8 bond?

9      **MR. JOHNSON**:  Your Honor, we are recommending

10 pretrial detention based on both risk of flight and danger

11 to the community.

12      **THE COURT**:  Okay.  Are you ready today?

13      **MR. JOHNSON**:  We are not ready today, Your Honor.

14      **THE COURT**:  Okay.  Let me see how much time

15 Mr. Watts needs.  I set this for Monday at the earliest.

16 If you need more time, Mr. Watts, tell me.

17      **MR. WATTS**:  May I have a moment, Your Honor?

18      **THE COURT**:  All right.

19      **MR. WATTS**:  Your Honor, we would prefer that it

20 be set for next Tuesday, if it is possible.

21      **THE COURT**:  Sure.  Can your witnesses be here,

22 Mr. Johnson?

23      **MR. JOHNSON**:  Yes, Your Honor.  I did want to

24 advise the Court that you do understand we are requesting

25 detention in this sort of case, which is somewhat unusual.

1          We do have a somewhat extensive presentation,

2     though.   We have six different money laundering

3     transactions which we think are relevant.

4          They are all video taped.   We would like to

5     present kind of a shortened core version of those as well

6     as some other facts that we think establish that Mr. Mesina

7     is almost certain of conviction and is a danger to the

8     community and a risk of flight, based on foreign contacts.

9          THE COURT:   All right.   I will set the hearing

10    then for next Tuesday.   That's the 28th at 9:30.

11         MR. JOHNSON:   Thank you, Your Honor.

12         THE COURT:   I will temporarily detain you as a

13    risk of flight until I have the hearing, Mr. Mesina.

14         THE DEFENDANT:   Thank you, Your Honor.

15         THE COURT:   Yes, sir.

16         (Whereupon the proceedings were concluded)

17

18

19

20

21

22

23

24

25

1               **C E R T I F I C A T E**

2          I hereby certify that the foregoing is an accurate

3     transcription of proceedings in the above-entitled matter.

4

5     _____     _____
        DATE                    **JERALD M. MEYERS, RPR-CM**
6                                 Miami, FL  33128-7797

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25



**U.S. Department of Justice**

*United States Attorney*
*Southern District of Florida*

Mark D. Johnson
*Assistant United States Attorney*

*505 South Second Street*
*Suite 200*
*Ft. Pierce, FL 34950*
*(561) 466-0899*
*(561) 466-1020 (fax)*



**GOVERNMENT EXHIBIT**

CASE NO. 03–14010–DLG

EXHIBIT NO. 15

July 9, 2003

Nellie L. King, Esq.
319 Clematis Street
Suite 107
West Palm Beach, Florida 33401-4615

      Re: *United States v. Roman C. Mesina,* Case No. 03-14035-CR-Graham

Dear Ms. King:

      I have just received the PSI in the above captioned case and want to inform you that the government finds your client's letter dated June 13, 2003, to be inadequate to satisfy the requirements of USSG §3E1.1, concerning acceptance of responsibility. With respect to that letter, the government specifically objects to the defendant's failure to make any mention of the manner in which the total of $294,000 in currency given to your client by a cooperating individual was deposited in the various financial institutions from which they were returned to the IRS undercover accounts.

      This is a particularly glaring omission because during video/audio recorded meetings, your client repeatedly claimed to have an individual or individuals in Bank of America who would warn him of official inquiries concerning transactions related to the undercover accounts. During the meeting with undercover agents on January 22, 2003, the day of your client's arrest, at three different times your client advised the undercover agents that he had been informed by his bank insiders of regulators' interest in a $30,000 cashiers check from Canada. In fact a such a check, purchased by a Barbara Black, was deposited in an account controlled by your client and funds from that check were ultimately deposited into the undercover account in connection with $125,000 in currency received by your client and his co-defendant on December 20, 2003.

      Your client's letter recites only that: "[a]gain the funds were laundered through a Bank of America account," without even mentioning whether it was his account or the government's.

Nellie L. King, Esq.
July 9, 2003
Page 2

In addition, you client told undercover agents at the January 22, 2003, meeting that these his people at the Bank of America would keep CTR's (Cash Transaction Reports) from being filed. Significantly, although some nearly $300,000 in currency was somehow deposited in financial institutions by your client, not one single CTR concerning any account your client can be associated with was ever filed by any financial institution, despite federal regulations requiring the filing of such any transaction involving currency in an amount of $10,000 or more. Moreover, your client accomplished a transfer of $122,500 from an account he totally controlled, Jewish Fellowship, Inc., to the IRS undercover account without generating any record of how or why the tranfer was accomplished. The government can only establish you client's involvement because he was photographed standing in front of a teller station at the Bank of America Centre in West Palm Beach, at the time the transfer of funds was made from that station.

When asked by agents at his proffer in March about the numerous claims concerning bank insiders that your client had made to the cooperating individual and the undercover agents, your client told the agents that he had no such contacts and that he was just lying when he said he did.

Finally, at the meeting with undercover agents on January 22, 2003, your client stated that he, and the co-defendant, had moved all the $125,000 in currency received from the cooperating individual on December 20, 2002, "offshore" and would also be moving the $500,000 in currency that he ultimately accepted on that day "offshore," utilizing unnamed foreign associates. During the same meeting your client told the undercover agents that he had foreign clients who utilized the same "float" of funds methodology he was proposing to utilize concerning the $500,000 he subsequently accepted from the undercover agents.

When asked by agents at his proffer in March about these "offshore" associates, your client told the agents that he had no such "associates" and that he was just lying when he said he did. When your client was confronted with records of telephone calls made to a MetroPCS cell phones that were not made from domestic (or Canadian) land based or cellular telephones, he told investigators that he'd sold the cell phone in question. When advised that records showed calls made from that phone within hours of the calls in question his response was that when he got phone calls from people he didn't know he would just lay the phone down. Significantly, the the pen-register device installed on your client's home telephone establishes that the last phone call made by your client before he left home to pick up the $500,000 he had agreed to launder was made via an overseas operator.

Nellie L. King, Esq.
**July 9, 2003**
**Page 3**

Eleventh Circuit case law provides that even where a defendant accepts responsibility for the "counts of conviction", a court may refuse to make a downward adjustment for acceptance of responsibility where the defendant fails to answer specific questions about how he carried out the crime. *United States v. Hernandez*, 160 F.3d 661, 667 (11th Cir. 1998); *See also, United States v. Mullens*, 65 F.3d 1560 (11th Cir. 1995). It should also be noted that it is the burden of the defendant to establish that he is entitled to the downward adjustment not the government's to establish that he is not.

Certainly where a defendant, such as your client, already faces a denial of acceptance of responsibility based on obstruction of justice as your client does based on his perjury to the Magistrate Judge with respect to his need for appointed counsel, a refusal to explain how he committed the crime of conviction absolutely removes your client from the category of "extraordinary cases" as that terms is used in application note 4 of USSG §3E1.1.

Moreover his refusal answer the above questions is relevant in determining where in the guideline range of 151 to 188 months the defendant should be sentenced.

Very truly yours,

MARCOS DANIEL JIMENEZ
UNITED STATES ATTORNEY

By: 

Mark D. Johnson
Assistant United States Attorney

**Woodlake Psychological Associates, P.A.**
**Clinical and Forensic Psychology**
**3865 10th Avenue, North**
**Lake Worth, Florida 33461**
**(561) 966-8423 Fax: (561) 966-8424**

**Paul E. Bryan, Jr., Ph.D.**                    **Raul Diaz, Ph.D.**

### VITA
**Paul E. Bryan, Jr., Ph.D.**
Licensed Psychologist



GOVERNMENT
EXHIBIT

CASE
NO. 03-14010-DLG

EXHIBIT
NO.    17

3865 10th Avenue, North              Office: (561) 966-8423
Lake Worth, Florida 33461

**Education**

August 1986: Ph.D. in Psychology, University of Florida.
Dissertation: "A Systematic Approach to the Treatment of Emotionally Disturbed
Adolescents Referred to a Special Day School." Major Professor: Eileen B. Fennell

August 1982: M.A. in Psychology, University of Florida.
Thesis: "Locus of Control as Moderator of Variance
Between Self-concept and Work Performance in
Economically Disadvantaged Black Adolescents."

May 4, 1977: B.A. in Psychology and Sociology, Mercer
University. Graduated Cum Laude.

**Work**
**Experience**

6/90 to **Licenced Psychologist**, Greenacres, Florida.
Present
Full-time private practice. Services include individual psychotherapy with
adolescents and adults; marital and group psychotherapy; Stress management
incorporated in treatment as needed; substance abuse treatment; psychological,
neuropsychological, and intellectual assessments utilizing various objective and
projective instruments to address a variety of concerns; Consultations with
psychiatric hospitals as needed. Court Ordered psychological evaluations.

**Vita, Page 2**

6/89 to   **Psychological Consultant,** Palm Beach County Sheriff's Office
Present  West Palm Beach, Florida.

> Perform pre-employment psychological evaluations on individuals applying for positions with PBSO; other services include consultations with PBSO employees referred by administration; crisis intervention, such as providing counseling to those involved in a shooting; co-facilitating a peer counseling group, conducting inservices or workshops as requested; providing individual therapy and consultation to PBSO employees, their spouses, and/or dependents upon request, including but not limited to such problems as marital discord and substance abuse.

8/90 to   **Psychological Consultant,** Palm Beach Shores Police
Present  Department, Palm Beach Shores, FL

8/93 to   **Psychological Consultant,** Palm Beach County School Board
Present  Police Department

7/94 to   **Psychological Consultant,** Lake Worth Police and Fire Departments
Present  Lake Worth, FL

7/94 to   **Psychological Consultant,** Mangonia Park Public Safety
Present  Mangonia Park, FL

7/94 to   **Psychological Consultant,** Lake Clark Shores Police
Present  Department, Lake Clark Shores, FL

3/95 to   **Psychological Consultant,** Boynton Beach Police and Fire Departments
Present  Boynton Beach, FL

7/95 to   **Psychological Consultant,** Palm Beach Community College
Present  Law Enforcement and Corrections Academies, Lake Worth, FL

9/95 to   **Psychological Consultant,** Riviera Beach Police Department
Present  Riviera Beach, FL

2/97 to   **Psychological Consultant,** West Palm Beach Police and Fire Departments
Present  West Palm Beach, FL

9/97 to   **Psychological Consultant,** Broward County Sheriff's Office
Present  Fort Lauderdale, FL

10/99 to  **Psychological Consultant,** Lantana Police Department
Present  Lantana, FL

Vita, Page 4

assertiveness training class, attended staff meetings with multidisciplinary team, attended community meetings. Mental Hygiene Rotation: Facilitated dual diagnoses PTSD and schizophrenic Vietnam Veteran's group, formal assessments and reports, individual psychotherapy, and co-led stress management group.

10/83 to   **Severely Emotionally Disturbed Program Therapist**, Mental Health Services, Inc.,
8/85      Gainesville, FL

Child, Youth and Family Programs: consultant for an alternative school for severely emotionally disturbed children and adolescents; individual, group, couple and family therapy; psychosocial assessments, reports and discharge summaries; home visits to families of alternative school children; member of Affirmative Action Committee.

6/81 to   **Counselor II**, Mental Health Services, Inc.,
8/83      Gainesville, FL

Adult and aging Program: individual, group and couple therapy; conducted intake interviews, psychosocial assessments, crisis intervention, supervised practicum and intern student from UF and served Staff personnel and Affirmative Action Committees.

6/80 to   **Vocational Counselor I**, Comprehensive Employment Training Program (CETA)
5/81      Gainesville, FL

On Job Training (OJT): counseled trainees concerning work related or personal problems; developed jobs in private sector for trainees; liaison between CETA/OJT and businesses; conducted stress management workshops for employees.

9/79 to   **Psychologist Trainee**, Gainesville Veteran's Administration Medical Center
8/80      Gainesville, FL

Alcohol Dependence Treatment Unit: Conducted groups on stress management, did intellectual and psychological assessments, and presented test data at staff meetings. Part Time.

PUBLICATIONS

"Psychological Assessment of Black Americans."
Psychotherapy in Private Practice, Vol 7 (3) 1989.

Vita, Page 5

**PROFESSIONAL**
**AFFILIATIONS**

American Psychological Association (APA)
Division of Psychologists in Public Service (Police and
Public Safety)
Florida Psychological Association   (FPA)
Association of Black Psychologists
Council of Police Psychological Services (COPPS)
Minority Law Enforcement Council

**PERSONAL**
Born December 31, 1954
Excellent Health

**ACTIVITIES**
Enjoy traveling, reading, listening to music, camping,
racquetball, basketball, and swimming when time permits.
Member of Kappa Alpha Psi Fraternity, Inc.

**REFERENCES**

Available upon request

# Woodlake Psychological Associates, P.A.

CLINICAL AND FORENSIC PSYCHOLOGY
3865 10TH AVENUE NORTH
LAKE WORTH, FLORIDA 33461
TELEPHONE: (561) 966-8423

PAUL E. BRYAN, JR., PH.D.                                      RAUL DIAZ, PH.D.

# FAX COVER SHEET

Fax No. (561) 966-8424

TO FAX TELEPHONE NUMBER: 772-466-1020      DATE: 8/1/03

TIME: 12:25 P

SEND TO: Mark Johnson       FROM: Dr. Bryan

## CONFIDENTIAL

THE INFORMATION CONTAINED IN THIS FACSIMILE MESSAGE IS PRIVILEGED AND
CONFIDENTIAL, AND IS INTENDED ONLY FOR THE USE OF THE INDIVIDUAL
NAMED ABOVE AND OTHERS WHO HAVE BEEN SPECIFICALLY AUTHORIZED TO
RECEIVED SUCH.  IF THE RECIPIENT IS NOT THE INTENDED RECIPIENT, YOU ARE
HEREBY NOTIFIED THAT ANY DISSEMINATION, DISTRIBUTION OR COPYING OF
THIS COMMUNICATION IS STRICTLY PROHIBITED.  IF YOU HAVE RECEIVE THIS
COMMUNICATION IN ERROR, OR IF ANY PROBLEMS HAVE OCCURRED WITH THIS
TRANSMISSION, PLEASE NOTIFY US IMMEDIATELY BY TELEPHONE. THANK YOU.

### TOTAL NUMBER OF PAGES, INCLUDING COVER SHEET: 6

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

## MESSAGE